RECEIVED
IN LAKE CHARLES, LA.

OCT 14 2010

TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| DORÉ ENERGY CORPORATION | : | DOCKET NO. 2:05 cv 1657 |
| vs. | : | JUDGE MINALDI |
| THE PROSPECTIVE INVESTMENT & TRADING COMPANY, LTD. and ATLANTIC AND GULF PETROLEUM COMPANY | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Before the Court is a Motion for Partial Summary Judgment filed by Doré Energy Corporation ("Doré") [Doc. 263]. The defendants, Prospective Investment & Trading Company ("Prospective") and Atlantic and Gulf Petroleum Company (collectively "the defendants"), filed an Opposition as well as a Cross-Motion for Partial Summary Judgment [Doc. 272]. In addition to its Opposition and Cross-Motion for Partial Summary Judgment, the defendants filed a Reply [Doc. 285].

## FACTS

This suit arises out of a dispute over the enforcement of a Settlement Agreement pertaining to a mineral lease that the current parties properly executed in 2002. In 1927, Cameron Meadows Land Company and H.M. Henshaw executed a mineral lease ("the Lease") on land located in Cameron Parish, Louisiana.[1] Initially, the lease covered 11,540 acres. The lease now covers, at the most, three square miles (1,920 acres). In 1995, Doré purchased land in Cameron Parish from the Cameron Meadows Land Company that included three sections of land,

---

[1] Def.'s Statement of Uncontested Material Fact ¶ 1; Pl.'s Statement of Undisputed Facts ¶ 2.

1

sections 21, 27, 28 of Township 14 South, Range 13 West, thus becoming Cameron Meadows' successor-in-interest.[2] In 1999, Prospective acquired interest as a lessee under the Lease, and is the operator on record.[3]

In 2000, Doré filed suit against Prospective in Cameron Parish requesting cancellation of the lease for failure to properly explore and develop a portion of the property, which was later removed to federal court.[4] In 2002, the parties entered into a Settlement Agreement resolving the 2000 lawsuit, which released certain acreage of the lease.[5] The enforcement of this Settlement Agreement is at the crux of the present lawsuit.

Paragraph 10 of the Settlement Agreement provides that:

> PITCO and Atlantic agree to execute a Partial Release of the Cameron Meadows Lease covering the Disputed Area,[6] except for Sections 21, 27, and 28, where the Partial Release will be limited to all depths below 10,500'. The Cameron Meadows Lease will remain in effect down to 10,500' in Sections 21, 27, and 28 (the "Retained Area").[7]

Paragraph 11 of the Settlement Agreement provides that:

> PITCO and Atlantic agree: To execute a Partial Release (i) as to all acreage within the Retained Area which is not at that time in producing units three years from the effective date of this Agreement; and (ii) as to all depths below the deepest producing horizon as of three years from the effective date of this Agreement. Doré and PITCO, shall, in good faith, attempt to negotiate the size and extent of such producing unit or units before

---

[2] Def.'s Statement of Uncontested Material Fact ¶ 2; Pl.'s Statement of Undisputed Facts ¶ 1.

[3] Def.'s Statement of Uncontested Material Fact ¶ 3; Pl.'s Statement of Undisputed Facts ¶ 3.

[4] Def.'s Statement of Uncontested Material Fact ¶ 9; Pl.'s Statement of Undisputed Facts ¶ 4.

[5] Def.'s Statement of Uncontested Material Fact ¶ 10; Pl.'s Statement of Undisputed Facts ¶ 5; Pl.'s Ex. 4.

[6] The "disputed area" is that portion of the leased premises lying outside of Section 22. Settlement Agreement ¶ 9.

[7] *Id.* ¶ 10.

> instituting a proceeding before the Louisiana Commissioner of Conservation. Doré, PITCO and Atlantic agree that under no circumstances shall any unit around any producing well bore in the Retained Area[8] be less than 160 acres.[9]

Thus, the defendants agreed to release the retained portions of the lease that were not in "producing units" after three years from the execution of the Settlement Agreement.

In the three year grace period, neither defendant sought to create units in the established area with the Louisiana Commissioner of Conservation or by voluntary agreement.[10] Of the twenty-five wells in the Retained Area, only one well was still producing from the unit-designated depth on the third anniversary of the Settlement Agreement–the Planulina 1 Sand, Reservoir A, which was established by the Office of Conservation Order No. 202-GG on January 24, 1986.[11]

In March 2005, Doré sent letters to the defendants demanding that they surrender the lease as to all acreage that was not in producing units, including the 24 units that were still producing but not from unit-designated depths. The lease owners refused. They offered to negotiate with Doré to establish the shape and configuration of units around the producing wells. Rather than negotiate, Doré filed a suit in Louisiana state court in September of 2005, seeking enforcement of 2002 settlement agreement. After the defendants removed the case to Federal

---

[8] Although much of the Retained Area contains no wells at all, the settlement agreement prescribed 160 acres as the minimum size of a unit. This 160 acre minimum is one-fourth of a standard governmental section of land. As noted earlier, there are three sections of land in the Retained Area. One section has wells on only one half of its territory. Another section contains only one well. The final section has wells on only one of its quarter sections. See Def.'s Att. J.

[9] Id. ¶ 11. All parties agree that the third anniversary of the Settlement Agreement occurred on January 28, 2005. Def.'s Statement of Uncontested Material Fact ¶ 25; Pl.'s Statement of Undisputed Facts ¶ 8.

[10] Pl.'s Memo. in Opposition to Def.'s Cross-Mot. for Summary Judgment 7.

[11] Pl.'s Ex. SJ6 (Aff. of Patti Reed).

court and the parties conducted discovery, Doré file a motion for partial summary judgment. The motion requested that this Court terminate the lease except for the one unit still producing from its unit-designated depth–the Planulina 1 Sand, Reservoir A.

On September 17, 2007, this Court granted Doré's motion for partial summary judgment. *Doré Energy Corp v. Prospective Investment & Trading Co.*, 2007 WL 2736613 at *4 (W.D.La. 2007). Interpreting Paragraph 11 of the 2002 settlement agreement, this Court held that "producing units" are (1) those units created either (a) voluntarily or (b) by the Louisiana Conservation Commission (if an agreement cannot be reached) that (2) "produce minerals in paying quantities." *Id.* at *3. The Court found that the parties were required to obtain new unit designations for any unit that once had a well producing from one depth and was now, after re-completion, producing at a different depth from the same well bore. *Id.* Because the parties failed to create successor units by agreement or governmental order to reflect the new production depths, there was only one producing unit remaining on the lease on the third anniversary of the settlement agreement. *Id.* As a result, this Court terminated the lease as to all of the Designated Area except for the 160 acres surrounding the Planulina 1 Sand, Reservoir A. *Id.*

After granting Doré's motion for partial summary judgment, this Court certified its ruling for interlocutory review. *Doré Energy Corp v. Prospective Investment & Trading Co.*, 570 F.3d 219, 224 (5th Cir. 2009). On May 28, 2009, the Fifth Circuit reversed this Court's ruling. *Id.* at 222. According to the Circuit Court, the "fulcrum on which the outcome of this dispute turn[ed]" was the time to complete the obligation under the 2002 settlement agreement, which required that the parties first negotiate in good faith on forming producing units, then to seek a state regulatory order if those negotiations failed. *Id.* at 221-22. While adopting this Court's definition of "producing unit," the Fifth Circuit disagreed with this Court's interpretation of the

4

second sentence of paragraph 11, the contractual deadline to determine formal "unit" designations and thus the application of the third sentence of paragraph 11. *Id.* at 224-30.

The first sentence of paragraph 11 requires an execution of a partial release as to all acreage outside and depths below the units that were producing on the designated 2005 date. *Id.* at 227. The second sentence requires Doré and Prospective to attempt to negotiate units and if they fail, institute a proceeding before the relevant state official. *Id.* at 227-28. Although the Circuit Court found that the settlement agreement "sets a date certain by which to determine if there was production in a unit," it did not find that "it clearly sets a date certain for when the unit had to be officially formed." *Id.* at 228. In other words, the contract provides that the unit or units must be "producing" as of a certain date–January 28, 2005, the three year anniversary of the settlement agreement–but does not provide a date to determine when the parties must form these "units" *Id.*

Because the contract failed to define when the parties must determine "units," Louisiana law required the parties to determine "units" within a reasonable amount of time. *Id.* Otherwise, the Fifth Court reasoned, the settlement would require too drastic a result; the lease owners would have agreed to abandon all producing wells that merely contained flawed unit designations. *Id.* Thus, the Fifth Court held that the contract required the parties, within a reasonable amount of time, to negotiate new unit designations in good faith or if an agreement cannot be reached, seek a regulatory order for a new unit designation reflecting the new depths. *Id.*

Significantly, the final sentence of paragraph 11 stated all parties agreed that under no circumstances shall any unit around any producing well bore in the Retained Area be less than 160 acres. *Id.* The Circuit Court found that "[t]he parties agreed that the lease owners would for

5

three years retain the nonproductive acreage under the lease in the three sections of land, but at that anniversary day, the acreage would be lost." *Id.* Although 160 acres is the minimum, the parties may agree or the Commissioner of Conservation may also form larger units, resulting in a greater proportionate holding of the Retained Area. *Id.* "Thus the lease owners were entitled for every well producing in paying quantities on the applicable date, to hold at least 160 acres of the lease down to the depth of production--no ifs, ands, or buts." *Id.*

In sum, the contract requires that Prospective release all lands outside of producing units. *Id.* To determine what land Prospective must release, the parties must determine units. *Id.* at 227-29. The parties must agree or, in the absence of an agreement, the Commissioner of Conservation must designate units. *Id.* at 228. Those units, moreover, must have produced minerals in paying quantities as of January 28, 2005. *Id.* In no event, however, will a unit be less than 160 acres surrounding a producing well bore. *Id.*

On remand, the Fifth Circuit requires this Court to consider whether the failure to begin negotiations for reforming any producing units before Doré filed suit was a "failure to act within a reasonable time under the settlement." *Id.* at 230. If the parties failed to act within a reasonable time and thus breached the settlement agreement, this Court must determine whether the lease owners alone are responsible. *Id.* Available remedies for a breach do not include forfeiture. *Id.* As a result, this Court is responsible for determining "the best means to enforce the obligations under the settlement agreement to form the new units." *Id.*

Since the Fifth Circuit's ruling, the parties have "attempted" to negotiate and agree on the size, shape, and location of units.[12] The parties, however, have failed to reach an agreement.[13]

---

[12] Def.'s Mot. Summ. J. 1 [Doc. 272]; Pl.'s Mot. Summ. J. 4, ¶ 13 [Doc. 263].

[13] Def.'s Mot. Summ. J. 1 [Doc. 272]; Pl.'s Mot. Summ. J. 4, ¶ 13 [Doc. 263].

6

Despite a declaration that negotiations have reached an impasse, neither party has initiated proceedings or sought assistance from the Louisiana Commissioner of Conservation.[14] Instead, Doré filed a motion for partial summary judgment, requesting this court to hold that The Cameron Meadows Land Company Well No. 90 ("Well No. 90") is not producing as a matter of law.[15] In its reply, the defendants both oppose the plaintiff's motion for partial summary judgment and seek partial summary judgment, asking the court to find that Well No. 90 is producing as a matter of law.[16]

Just as it argued before the Fifth Circuit, Prospective "ha[s] continuously maintained that they are willing to negotiate with Doré regarding the shape of units around each well."[17] *Id.* at 230. Although Prospective "ha[s] not used the phrase 'specific performance,'" this Court construes Prospective's summary judgment motion as a motion for this Court to fulfill the Fifth Circuit's directive and determine whether "the failure to begin negotiations for reforming any producing units before the suit was filed was a failure to act within a reasonable time under the settlement."[18] *Id.* at 228, 230. Accordingly, this Court must determine (1) whether there was a

---

[14] Def.'s Mot. Summ. J. 1 [Doc. 272]; Pl.'s Mot. Summ. J. 4, ¶ 13 [Doc. 263].

[15] Pl.'s Mot. Summ J. 5, ¶ 5. Well No. 90 is the only well the defendants were operating in Section 28, Township 14 South, Range 13 West, Cameron Parish. Def.'s Att. J. The well sits on the eastern edge of the northern half of Section 28. *Id.*

[16] Def.'s Mot. Summ. J. 1.

[17] Def.'s Br. Summ J. 1, 11. ("Instead of initiating [proceedings before the Louisiana Commissioner of Conservation], Doré has filed a motion for partial summary judgment seeking a ruling on an issue that is not pleaded by Doré's live complaint")

[18] Prospective seeks assistance from the Louisiana Commissioner of Conservation to form units, implicitly arguing that Dore's actions, such as filing this motion, are preventing the parties from enforcing the terms of the settlement agreement. *Id.* Thus, it appears that Prospective is seeking specific performance of that agreement, which requires a determination that the settlement agreement has been breached. *Id.*

breach of the settlement agreement, and (2) if so, the best "means to enforce the obligations under the settlement agreement to form the new units." *Id.*

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). "Furthermore, the party moving for summary judgment must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 323). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.*

If the movant satisfies this burden, however, then the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Tubacex*, 45 F.3d at 954. In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, a grant of summary judgment is warranted when the record as a whole "could not lead a rational finder of fact to find for the non-moving party." *Id.*

Federal Rule of Civil Procedure 56(d) states, in pertinent part that: "If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what

8

material facts are not genuinely at issue." Fed. R. Civ. P. 56(d). Rule 56(d) "simply empowers the court to withdraw sham issues from the case and to specify those facts that really cannot be controverted." 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2737 at 322 (3d ed. 1998).

As with a motion for summary judgment, partial summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See F.D.I.C. v. Massingill*, 24 F.3d 768 (5th Cir. 1994). Of course, to achieve a more orderly or expeditious handling of the entire litigation, "a court, in its discretion in shaping the case for trial, may deny summary judgment as to portions of the case that are ripe." *Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir. 1975), *rehearing denied* 509 F.2d 576 (5th Cir. 1975), *certiorari denied* 423 U.S. 873 (1975); Wright & Miller, *supra*.

For example, in *Powell v. Radkins* the plaintiff challenged the trial court's denial of partial summary judgment in a complex § 1983 case involving numerous defendants and intertwined theories of liability. 506 F.2d at 765. The Fifth Circuit held that even if partial summary judgment was proper as to any issues, the trial court was not required to grant partial summary judgment on those issues. *Id.* The Fifth Circuit reasoned that the trial court retained discretion to deny partial summary judgment even "as to portions of the case that are ripe therefor" when partial summary judgment would not expedite the adjudication. *Id.* Thus, if partial summary judgment would not simplify the trial or save time and expense, a court may deny partial summary judgment even if it would otherwise be proper. *Id.*

## ANALYSIS

Under Paragraph 11 of the settlement agreement, "[t]he parties agreed that the lease

owners would for three years retain the nonproductive acreage under the lease in the three sections of land, but at that anniversary day, the acreage would be lost." *Doré*, 570 F.3d at 228. Under the first sentence of Paragraph 11, Prospective is entitled to retain all of the leased land encompassing a "producing unit." *Id.* The parties may agree or the Commissioner of Conservation may form units. *Id.* If those designated units are producing as of January 28, 2005, Prospective is entitled to retain its lease over the land covering the unit. *Id.*

Furthermore, the third sentence of Paragraph 11 provides that no unit will be less than 160 acres surrounding a producing well bore. *Id.* Although 160 acres is the minimum, the parties may agree or the Commissioner of Conservation may form larger units, resulting in a greater proportionate holding of the Retained Area. *Id.* Under Louisiana law, "[p]roduction of minerals from a unit is tantamount to production from all lands within the unit." *Menoah Petroleum, Inc. v. McKinney*, 545 So. 2d 1216, 1220 (La. App. 2d Cir. 1989) (citing *Landry v. Flaitz*, 225 La. 223, 157 So. 2d 892 (1963); *LeBlanc v. Danciger*, 218 La. 463, 49 So. 2d 855 (1950); *Hunter Company v. Shell Oil Company*, 211 La 893, 31 So. 2d 10 (1947)). Thus, Prospective would be entitled to retain its lease as to all land within a designated unit that is producing as of January 28, 2005. *Doré*, 570 F.3d at 228. In no event, however, may those units be less than 160 acres surrounding a producing well bore. *Id.*

The issue here, however, requires assessment of the third sentence of Paragraph 11. To satisfy its requirement, there must be actual production from a well, and that production must be in paying quantities. *Menoah*, 545 So. 2d at 1220. The lessor has the ultimate burden of proving its entitlement to lease cancellation because of a lack of production in paying quantities. *Frazier v. Justiss Mears Oil Co.*, 391 So. 2d 485 (La. App. 2d Cir. 1980), *writ denied*, 395 So. 2d 340 (La. 1980).

The Louisiana Mineral Code provides a definition for production in "paying quantities."

> [Production] is considered to be in paying quantities when production allocable to the total original right of the lessee to share in production under the lease is sufficient to induce a reasonably prudent operator to continue production in an effort to secure a return on his investment or to minimize any loss.

La. Rev. Stat. Ann. § 31:124 (2009); *Lege v. Lea Exploration Co., Inc.*, 93-605, P. 2 (La. App. 3 Cir. 2/2/94); 631 So. 2d 716, 717, *writ denied*, 94-450 (La. 4/4/94), 635 So. 2d 1112 (noting that Article 124 is the same test articulated by the Texas Supreme Court in *Clifton v. Koontz*, 325 S.W.2d 684, 691 (1959)). Factors that would influence a reasonable and prudent operator include: (1) "'The depletion of the reservoir and the price for which the lessee is able to sell his produce, (2) the relative profitableness of other wells in the area, (3) the operating and marketing costs of the lease, (4) net profit, (5) the lease provisions, (6) a reasonable period of time under the circumstances, and (7) whether or not the lessee is holding the lease merely for speculative purposes.'" *Lege*, 93-605, P. 2 (La. App. 3 Cir. 2/2/94); 631 So. 2d 716, 717 (quoting *Clifton*, 325 S.W.2d at 691).

Louisiana Courts, thus, require a profit. *Menoah Petroleum*, 545 So. 2d at 1216. The "[p]roduction income must exceed operating expenses." *Id.* To determine net profit, the fact-finder must assess production income and operating expenses over the relevant time period. *Lessors Petroleum Co., Inc. v. McKinney*, 545 So. 2d 1216, 1220 (La. App. 2d Cir. 1989).

All income associated with a well is not production income; all expenses associated with a well are not operating expenses. *Lessors*, 545 So. 2d at 1220; *Lege*, 93-605, P. 2 (La. App. 3 Cir. 2/2/94); 631 So. 2d 716, 717. Production income is "the total original right of the lessee to share in production under the lease." La. Rev. Stat. Ann. 35:124. Thus, payments that reflect a return to capital and amounts not allocable to original royalty payments are excluded. *See Lege*,

93-605, P. 2 (La. App. 3 Cir. 2/2/94); 631 So. 2d 716, 717.

Operating expenses are ordinary, recurring expenses; they do not include capital expenditures.[19] *Id.*; *but see CCH, Inc. v. Heard*, 410 So. 2d 1283, 1285-86 (La. App. 1 Cir 1982) (including capital expenditures in calculating whether a well was producing in paying quantities). According to prevailing law and general accounting principles, "expenses can be categorized as (1) lease operating expenses, (2) repair and remedial expenses, (3) equipment purchases, and (4) completion or recompletion (workover costs)." *Lege*, 631 So. 2d at 718. Operating expenses are "distinguish[able] from the other three categories in that the other three categories are considered extraordinary expense, that is, expenses that would not be thought of as normal operating costs." *Id.* Examples of extraordinary expenses include equipment costs, overhead, depreciation of original equipment, and reworking expenses. *Heirs v. Union Texas Petroleum Corp.*, 1992 WL 91938 at *3 (E.D.La. 1992).

Because the determination of operating expenses is often a fact-intensive inquiry, mere debits and credits listed on a balance sheet are often insufficient alone to determine whether a well is producing in paying quantities. *See Lege*, 93-605, P. 4 (La. App. 3 Cir. 2/2/94); 631 So. 2d 716, 718-19 (finding that operating expense analysis requires an assessment of the purpose of the expense; therefore, an expense may not be an operating expense even when it is "necessary to continue and maintain production."). As the Supreme Court of Oklahoma held in *Mason v. Ladd Petroleum Corporation* and the Louisiana Appellate Court for the First Circuit reasoned in *Lege*

---

[19]The distinction between capital costs and operating expenses is important because, as some courts have apparently found, even though the expense of drilling and equipping a well may never be paid, and the operation as a whole results in a loss, the lease may still result in a production in paying quantities. *Garcia v. King*, 164 S.2.2d 509, 511 (1942); see *also Vance v. Hurley*, 215 La. 805, 41 So. 2d 724 (La. 1949); *Lege*, 93-605, P. 2 (La. App. 3 Cir. 2/2/94); 631 So. 2d 716, 717.

*v. Lea Exploration Company*, even a determination of operating expenses that appeal to logic and common sense have little probative value if it ignores legal and generally accepted accounting procedures. *Mason*, 630 P.2d 1283, 1285 (Okla. 1981); *Lege*, 93-605, P. 4 (La. App. 3 Cir. 2/2/94); 631 So. 2d 716, 718. Generally accepted accounting procedures, moreover, may lead to one determination, while "equally accepted accounting practices, using acceptable and alternate methods and practices, can result in an opposite result." *Mason*, 630 P.2d 1283, 1285 (Okla. 1981).

In addition, a well is producing in paying quantities if it is producing at a profit over "a reasonable period of time." 93-605, P. 2 (La. App. 3 Cir. 2/2/94); 631 So. 2d 716, 717 (quoting *Koontz*, 325 S.W.2d at 691). When a contract designates the date to establish production in paying quantities, the analysis must not include any time period beyond that designated in the contract. *Heirs*, 1992 WL 91938 at *4.

In its Motion for Partial Summary Judgment, Doré argues that Well No. 90 was not producing as of January 28, 2005; thus, it is entitled to a release of the acreage surrounding Well No. 90 under the Settlement Agreement.[20] To support its argument, Doré cites discovery materials, including financial records supplied by Prospective and statements from Prospective's President, Adam Singer. Doré argues that the financial records summarize monthly and annual production income and operating expenses, termed "LOE" or Lease Operating Expenses on the financial records, from each well beginning in January of 2005 and ending in 2006. According to Doré, because the financial statements omit capital expenditures, each financial record of Well No. 90 should be viewed as the greatest possible amount of profit.[21]

---

[20] Pl.'s Mot. Summ. J. 3 [Doc. 263].

[21] *Id.* at 13-16.

13

To determine whether Well No. 90 was producing in paying quantities, Doré simply subtracted all expenses listed under the LOE column and the ad valorem taxes from the revenues allocated to Well No. 90. Doré first notes that in January of 2005, the well operated at a loss of $884. The well continued to operate at a loss for the entire year of 2005 until it "finally ceased producing altogether in October of 2005."[22] Because annual production revenues for Well No. 90 in 2005 totaled $9,749 while the operating expenses for the well totaled $36,082, the well operated at a net loss of $26,333.[23]

Next, because Prospective recommenced operations on Well No. 90 in January and February 2006, Doré analyzed the total revenues and expenses for 2006. After following the same procedure it used to determine net profit for 2005, Doré found the expenses exceeded sales revenue in 2006.[24] Finally, in a footnote, Doré noted that "the well did not produce at all in 2007."[25]

In its opposition, Prospective argues, in part, that partial summary judgment is improper.[26] The 2002 Settlement Agreement requires the release of acreage not included within a producing unit. Because the parties are still trying to form "producing units," Prospective submits that it is unnecessary and premature to determine whether Well No. 90 was producing in paying quantities. For instance, assuming that Well No. 90 is not producing in paying quanities,

---

[22] *Id.* at 17.

[23] *See id.* at 17.

[24] *Id.*

[25] *Id.* at fn. 35

[26] Def.'s Mot. Summ. J. at 11 [Doc. 272].

14

it may still "fall within the boundaries of a unit that includes other producing wells."[27] Therefore, the determination of "producing units" may render the issue of whether Well No. 90 is producing irrelevant.

Prospective also argues that it is entitled to partial summary judgment since Well No. 90 is producing as a matter of law.[28] According to Prospective, whether a well is producing in paying quantities requires consideration of more than revenues and expenses; instead, it requires an assessment of the costs associated with a well when considering the purpose of those costs. The parties must look past the financial statements and analyze the substance of the costs.[29]

The analysis, moreover, should not include all expenses. Instead, when determining the costs attributable to a single well in a multi-well field, "the Court should only consider the incremental costs of operating that well when determining whether the well was producing in paying quantities."[30] Accordingly, Prospective argues, expenses include only the costs of chemicals and taxes.

In addition, Doré's analysis of the financial statements, according to Prospective, is improper because Doré analyzed an incorrect time period to determine whether Well No. 90 was producing in paying quantities.[31] While Doré analyzes the production period from 2005 to 2006, focusing on January of 2005 in particular, Prospective argues that the proper evaluation should begin in 2004 and conclude on January 28, 2005. Despite properly including January of 2005 in

---

[27] *Id.*

[28] *Id.*

[29] *Id.* at 7.

[30] *Id.* at 8.

[31] *Id.* at 9-10.

its determination, the analysis requires more than an assessment of one month.[32]

Similarly, because the contract requires production in paying quantities as of January 28, 2005, the assessment should not include any time after January 28, 2005. By focusing on time periods after January 28, 2005 and limiting a proper analysis to a single month, Doré used an improper time frame for determining whether Well No. 90 was producing in paying quantities as of January 28, 2005.[33]

After determining the proper time frame, Prospective submits that Well No. 90 is producing in paying quantities.[34] When considering only taxes and chemical treating costs as expenses, Well No. 90 generated a profit of $1,412 from June of 2004, when extraction from the well commenced, through January of 2005. Because the well generated a profit, it was producing in paying quantities as of January 28, 2005.[35]

Based on the Fifth Circuit's interpretation of Paragraph 11, partial summary judgment is premature for either party. *See Doré*, 570 F.3d at 228. The settlement agreement requires the parties to designate units, and if they cannot agree, the Commissioner of Conservation must designate units. *Id.* The parties have yet to designate units or seek a designation from the Commissioner of Conservation.

If partial summary judgment will not simplify the trial or save time and expense, a court retains discretion to deny partial summary judgment as partial summary judgment under Rule 56(d) is not "practicable." *Powell*, 506 F.2d at 765; *see also* Fed. R. Civ. P. 56(d). Here, because

---

[32] *Id.*

[33] *Id.*

[34] *Id.* at 10-11.

[35] *Id.*

"[p]roduction of minerals from a unit is tantamount to production from all lands within the unit," the area encompassing Well No. 90 may fall within part of a separate producing unit for wells located in either tract 27 or 21, assuming Well No. 90 does not form its own unit. *Menoah Petroleum, Inc. v. McKinney*, 545 So. 2d 1216, 1220 (La. App. 2d Cir. 1989) (citing *Landry v. Flaitz*, 225 La. 223, 157 So. 2d 892 (1963); *LeBlanc v. Danciger*, 218 La. 463, 49 So. 2d 855 (1950), *Hunter Company v. Shell Oil Company*, 211 La. 893, 31 So. 2d 10 (1947)). Until units are designated, partial summary judgement for either party is premature.

Next, Prospective seeks, and the Fifth Circuit requires, this Court to determine whether the failure of the parties to negotiate for the designation of units before filing suit was a breach of the settlement agreement. Under Louisiana Civil Code article 1778, when a term for the performance of an obligation is not determinable, "the obligation must be performed within a reasonable time." "What constitutes a reasonable time must be determined by the circumstances of each case." *Perrin v. Hellback*, 296 So. 2d 342, 344 (La. App. 4th Cir. 1974), *writ den.*, 300 So. 2d 184 (La. 1974). A reasonable amount of time is such time that is necessary and convenient to fulfill the contract's requirement. *Movant v. Russell & Clemmons*, 11 So. 2d 45, 47 (La. App. 1st Cir. 1942).

Here, the contract neither required a successful negotiation nor the payment of any money. Instead, it only required the parties to begin negotiations for reforming producing units within a reasonable amount of time. *Doré*, 570 F.3d 219, 230 (5th Cir. 2009). The parties did not enter negotiations before Doré filed this suit in September of 2005, almost nine months after the expiration of the settlement agreement. Louisiana courts have held that a failure to act within nine months is an unreasonable amount of time. *See, e.g., Olivier v. Roland*, 2003-1988, p. 4 (La. App. 4 Cir. 11/3/04), 888 So. 2d 998, 1000 (ten days); *Sanders v. Russell*, 37-839, p. 4 (La.

App. 2 Cir. 12/10/03), 864 So. 2d 219, 222 (six months); *Parquette v. Aceneaux Music Ctr., Inc.*, 425 So. 2d 362, 364 (La. App. 3 Cir. 1982) (six months); *Owens v. Robinson*, 329 So. 2d 766 (La. App. 2 Cir. 1976) (five months); *General Am. Life. Ins. Co. v. Natchitoches Oil Mill*, 160 F.2d 140, 143 (5th Cir. 1947) (five days). The contracts in those cases, moreover, did not require the parties to merely enter negotiations; rather, those contracts required payment of money or delivery of a good. *See, e.g., Olivier*, 888 So. 2d at 1000 (rent payment); *Sanders*, 864 So. 2d at 222 (loan repayment); *Parquette*, 425 So. 2d at 364 (loan repayment); *Owens*, 329 So. 2d at 767 (delivery of cotton); *General Am. Life Ins. Co.*, 160 F.2d at 143 (sale of property).

Furthermore, the lease in dispute generated significant amounts of money to both the lessor, Prospective, and the lessee, Doré. As such, the value of the wells provided both parties with an additional incentive to at least begin negotiations as soon as possible. "Time [is] of the essence in [a] contract dealing with a commodity traded in a . . . market." *Owens*, 329 So. 2d at 767. Based on the circumstances here, the parties failure to begin negotiations to reform any producing units for almost nine months was a failure to act within a reasonable time under the settlement agreement.

Under Louisiana law, "specific performance is the preferred remedy for breach of contract." *Bourgeois v. Dunn*, 822 So. 2d 708, 711 (2002). Unless specific performance is impracticable, it should be mandated. *See id.* While this Court may grant "specific performance plus damages for delay if the obligee so demands," damages are an inappropriate remedy at this stage of the litigation because this Court is not determining which party is responsible for the delay. *See* La. Civ. Code. Ann. art. 1986. This Court only finds that there has been a breach of the settlement agreement and, as a result, holds that specific performance is an appropriate

remedy.[36] Thus, the parties must engage in additional negotiations to form new unit designations; and, if the parties cannot agree, they must seek new unit designations from the Louisiana Commissioner of Conservation, as required under the settlement agreement. Accordingly,

IT IS ORDERED that Doré's motion for partial summary judgment is hereby DENIED.

IT IS FURTHER ORDERED that Prospective's cross-motion for partial summary judgment regarding the request for a finding that Well No. 90 is producing in paying quantities is hereby DENIED.

IT IS FURTHER ORDERED that the parties' failure to enter negotiations within nine months after the expiration of the settlement agreement was a breach of the settlement agreement.

IT IS FURTHER ORDERED that the parties must immediately enter good faith negotiations to form units; and, if an agreement is not reached within 90 days, the parties must seek unit designations from the Commissioner of Conservation.

Lake Charles, Louisiana, this 13 day of October, 2010.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

---

[36] While either party may argue that this Court should determine which party was at fault for the breach before determining the appropriate remedy, such a determination is unnecessary under Louisiana law. For instance, Doré may argue that in the event that Prospective breached the settlement agreement, Doré is entitled to cancellation of the lease. As the Fifth Circuit noted, in the event that the lease owners breached the settlement, cancellation of the lease is disfavored under Louisiana law. *Doré*, 570 F.3d at 229. In fact, "[t]he remedies available under Louisiana law and by these pleadings for such a breach do not include forfeiture." *Id.* at 230. The only other remedy available under Louisiana law is damages. This Court's current holding does not preclude this Court from later determining which party was responsible for the breach and then awarding appropriate damages. Until the parties have designated units, however, a determination of fault and thus damages is inappropriate.